UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
                                                  :
JOHN D. SMITH                          :          CASE NO. 5:04-cv-2353
                                                  :
              Petitioner,                 :
                                                  :
vs.                                            :          OPINION & ORDER
                                                  :          [Resolving Docs. 1, 25, 28, 30]
DAVID BOBBY, Warden,            :
                                                  :
              Respondent.              :
                                                  :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On November 29, 2004, John David Smith filed a Petition for Writ of Habeas Corpus

pursuant to 28 U.S.C. § 2254.  [Doc. 1.]  On May 23, 2005, Respondent David Bobby filed a Return

of Writ.  [Doc. 11.]  On January 14, 2005, the Court referred the case to Magistrate Judge Patricia

A. Hemann for a Report and Recommendation, pursuant to Local Rule 72.1.  [Doc. 4.]  On August

25, 2005, Magistrate Judge Hemann issued a report and recommended that the Court deny the

Petition for Writ of Habeas Corpus.  [Doc. 25.]  On September 23, 2005, Petitioner filed a timely

Objection to Magistrate Judge Hemann's Report and Recommendation, and on November 10, 2005,

he supplemented his Objection.  [Docs. 28 & 30.]

For the reasons set forth below, the Court **ADOPTS** Magistrate Judge Hemann's Report and

Recommendation and **DENIES** Smith's Petition for Writ of Habeas Corpus.

## I. Background

"In a proceeding instituted by an application for a writ of habeas corpus by a person in

custody pursuant to the judgment of a State court, a determination of a factual issue made by a State

court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  "The applicant shall have the

Case No. 5:04-cv-2353
Gwin, J.

burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* This

presumption of correctness also applies to findings of fact made by a state appellate court based on

the trial record. *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007).

The Court of Appeals of Ohio, Ninth Appellate District, Wayne County, described the facts

supporting Petitioner's conviction for the murder of Janice Elaine Hartman Smith when it considered

Petitioner's direct appeal after his conviction, judgment and sentence. The magistrate judge adopted

the Court of Appeals' factual history of the case in her Report and Recommendation. Petitioner

objects to those facts as "a parroting of [the prosecution's] misstatements" from the trial, but offers

no evidence to rebut the presumption of correctness. The Court therefore adopts the following

factual history from the opinion of the Court of Appeals:

> On August 30, 2000, the Wayne County Grand Jury indicted Mr. Smith on one count
> of aggravated murder, in violation of R.C. 2903.01. The deceased was Mr. Smith's
> ex-wife, Janice Elaine Hartman Smith ("Janice"), who disappeared in November of
> 1974. On April 2, 2001, the state expressed its intention to introduce evidence
> concerning the disappearance of Mr. Smith's second wife, Betty Fran Smith,
> (hereinafter referred to as the "New Jersey Evidence"), pursuant to Evid.R. 404(B).
> After a hearing on the matter, the trial court issued an order on May 31, 2001
> prohibiting the introduction of the New Jersey Evidence. A jury trial was held,
> commencing on July 2, 2001. In a verdict journalized on July 19, 2001, the jury
> acquitted Mr. Smith of aggravated murder but found him guilty of the lesser offense
> of murder, in violation of R.C. 2903.02. Mr. Smith was sentenced accordingly.
> ***
> At trial, during the state's case-in-chief, there was evidence presented that Janice,
> born March 2, 1951, married Mr. Smith shortly after their high school graduation
> when they were nineteen years old. The newly married couple moved to Columbus,
> Ohio, where they lived for approximately one and a half to two years. Gary Hartman
> ("Gary"), Janice's brother, testified that, when he went to visit Janice in Columbus,
> there was a domineering type of situation when Mr. Smith was present.
>
> Both Janice's mother, Betty Lippincott, and Gary recounted incidents during which
> Mr. Smith's temper flared. Betty Lippincott testified that Mr. Smith berated her and
> Janice for not being able to prepare anything but soup and sandwiches, while Gary
> related that Mr. Smith threw a chessboard against the wall after losing a game to him.

Case No. 5:04-cv-2353
Gwin, J.

According to Betty Lippincott, Janice called her from Columbus to inform her that she was divorcing Mr. Smith. Betty Lippincott described Janice as angry and upset during the telephone conversation. Sometime thereafter, in 1974, Janice returned to Wayne County, Ohio. For approximately one week, she lived with her father in Doylestown. In the Fall of 1974, Mr. Smith moved back to Wayne County, and, at the time of Janice's disappearance, it appears that Janice and Mr. Smith were living together in a trailer home in Wayne County. While living in Wayne County, Janice worked as a go-go dancer at a local establishment. She also served as a police informant on drug-related matters.

On November 10, 1974, Janice was physically attacked, sexually assaulted, and threatened. In a police report filed shortly after the incident, Janice described what had occurred. Janice stated that, while at the Portage Pub in Doylestown, she and her date, Leonard Bennett, were invited by a blond-haired man to a party at Larry Swaine's house. While at Larry Swaine's residence, a man threw her to the floor, removed her clothing, dragged her into the bedroom, and attempted to have sexual intercourse with her. According to Janice, the man told her that "[b]itches like you don't deserve to live." At that point, several other men entered the bedroom and held Janice down. She stated that she struggled and was struck in the face. Others attempted to engage in sexual relations with her. At some point, the blond-haired man came into the room with a loaded shotgun, pointed it at Janice, and said, "[n]arcs always have an easy way out." Another man shouted not to kill Janice, and Leonard Bennett and Janice were eventually released.

On November 14, 1974, the dissolution of Janice and Mr. Smith's marriage was finalized. Janice disappeared three days later on November 17, 1974. According to Deputy Sheriff Thomas L. Gasser of the Wayne County Sheriff's Department, on November 19, 1974, Mr. Smith filed a missing person report. In that report, Mr. Smith listed his wife, rather than ex-wife, Janice, as missing. According to the report, Mr. Smith had last seen Janice on November 17, 1974 with a stocky man who had a mustache at the Sun Valley Inn, a local tavern. Kathy Peridon, who was present when Mr. Smith made the report, confirmed that Janice had been at the Sun Valley Inn and that Janice dropped her off at her home. Kathy Peridon told the officer that Janice then left with the other occupant of her vehicle, a man.

In the report, Mr. Smith told Officer Gasser that Janice was wearing her wedding and engagement rings and a diamond watch. Additionally, Mr. Smith advised that, because Janice's beloved Mustang was parked at their trailer, Janice must have returned home in the early morning hours of November 18, 1974 and left before he woke, possibly to file charges against certain individuals.

Betty Lippincott testified that, although Mr. Smith had frequently contacted her before Janice's disappearance, he never called her to ascertain whether Janice had

Case No. 5:04-cv-2353
Gwin, J.

been located.

At trial, Michael Smith ("Michael"), the defendant's younger brother, testified that
Janice had told him that she and Mr. Smith were getting along better after they
decided to terminate their marriage and that Mr. Smith really loved Janice. Michael
said that he learned about Janice's disappearance from Mr. Smith. At that time, Mr.
Smith told him that Janice was going into a witness relocation program because she
was a drug informant. Subsequently, Michael helped Mr. Smith pack some of
Janice's belongings at the trailer and transport them to their grandparents' garage in
Seville, Ohio. The grandparents, the Chaneys, owned a Marathon filing station, and,
although they sold gas, they no longer used the garage for business purposes.

Michael testified that, during the Ohio State-Michigan football game, which was
played around the Thanksgiving holiday, he went to the garage to find out why Mr.
Smith was not watching the football game as he had in the past. Michael found his
brother building a wooden box out of plywood. In response to a question, Mr. Smith
stated that he was building a box in which to store some of Janice's belongings.
Michael testified that the box was long and skinny, approximately eight inches high,
sixteen inches wide, and four feet long. According to Michael, when he informed Mr.
Smith that the dimensions of the box were strange for storing things, Mr. Smith
became angry and said nasty things, so Michael left.

Michael related that he finished watching the Ohio State game and the following
football game before returning to the garage. When Michael went to the garage the
second time, Mr. Smith had completed the box and was rolling up (not folding)
Janice's clothes and tucking them around the edges of the box. Michael described his
brother as visibly upset, almost to the point of crying. Afterwards, he saw the box
sitting on the north part of the east wall of the garage with some of Janice's other
belongings. Michael stated that the box stayed there a few years but was eventually
relocated to the south part of the garage, where it remained until June of 1979.

In June of 1979, when he went home on his lunch break, his grandfather who
panicked came up to him, explaining that he had partially opened the box. When
Michael looked at the box, he could not tell what was inside but told his grandfather
that he would get rid of it. He took the box behind his house and completely pried
open the box and discovered a human skeleton that had the legs sawed off just below
the knee. Michael believed that the remains belonged to Janice. Instead of calling the
police, Michael called his brother in Hammond, Indiana and informed him that he
had opened and looked inside the box. According to Michael, Mr. Smith said that he
would be right there, arrived that night, and picked up the box.

Joseph Dabrowski, Mr. Smith's coworker at Copco Industries, testified that, in June
of 1979, Mr. Smith left work early one Friday purportedly to do some business in

Case No. 5:04-cv-2353
Gwin, J.

Seville, Ohio, and returned on Tuesday of the following week.

While his brother was picking up the box in Seville, Michael asked him for an explanation. According to Michael, Mr. Smith told him that two men drugged him and took him to a warehouse. When he woke, Janice was dead on the floor, and an FBI agent and a Wayne County Sheriff threatened to frame him for murder. At that point, Mr. Smith was rendered unconscious again and returned to his trailer. In his trailer, he found Janice dead on the floor. Michael testified that his brother then told him that he threw Janice in his van and quickly left but noticed a Wayne County Sheriff pulling up to his trailer.

After hearing this story, Michael offered to let Mr. Smith hide the box in the new cement being poured in certain apartments. Mr. Smith declined, put the box in his black Corvette, which was spacious enough to fit the box, and drove away. According to Michael, his brother told him that he was taking the box to Hammond, Indiana. Michael said he had not seen the box since.

Michael did not tell anyone about the box until May of 1999 after receiving a non-prosecution agreement and after his grandparents were deceased. In February of 2000, the Wayne County Sheriff's Department sent a letter to Gerry Burman, a Deputy Sheriff with the Newton County Indiana Sheriff's Department, requesting assistance in locating a Jane Doe. From the description, Officer Burman remembered a Jane Doe who was discovered in a plywood box in a very remote area in 1980 by the county's highway department. The box was found on County Road 400 one and a half miles from a major roadway and was approximately forty miles south of Hammond, Indiana. A law enforcement officer on the scene in 1980 stated that various items of clothing and a quilt were packed into and around the box. Photographs, which were admitted into evidence, corroborate this testimony. The condition of the grass where the box rested suggested that it had been in that location for a significant period of time.

Officer Burman assisted in exhuming the remains in March of 2000. The remains in the box were eventually identified as being Janice's. No cause of death, however, could be determined. Dr. Steven A. Symes, a forensic anthropologist, explained that, if the trauma, for instance a bullet, does not directly impact the bones it does not show up on the skeletal remains. Dr. Symes also testified that Janice's lower legs were sawed off postmortem, mostly likely with a serrated knife.

In March of 2000, a cadaver dog, Eagle, searched the Chaney garage. According to Eagle's handler, Sandra Anderson, Eagle alerted that the odor of human remains was present where the box had first been located according to Michael but did not alert to the alleged second location of the box.

Case No. 5:04-cv-2353
Gwin, J.

In 1999, Michael agreed to have his telephone conversations with Mr. Smith recorded while cooperating with law enforcement. During these conversations, audiotapes of which were played for the jury, Mr. Smith can be heard explaining that someone, as a practical joke, put a goat in the box and that the box was not anywhere near Seville, Ohio. In a telephone conversation on July 22, 1999, Michael lied to Mr. Smith, telling him that he was supposed to testify before a grand jury on August 5, 1999. After that telephone call, Mr. Smith disappeared for a few days. According to Trevor Alfred Haywood, Mr. Smith's coworker in Escondido, California, Mr. Smith did not initially report for work on August 5, 1999. Mr. Haywood testified that this was unusual because of Mr. Smith's good work habits.

At trial, Michael admitted that he had told various individuals different stories about where Janice's body was buried over the years. On cross-examination, the defense exposed the fact that, once Michael had decided to cooperate, he was inconsistent as to certain details of his story.

Special Agent Robert Hilland of the FBI testified that, in early 1998, he received a written request from the West Windsor Police Department, requesting assistance in investigating Janice's disappearance. Representatives of several law enforcement agencies in several states participated in the investigation. According to Special Agent Hilland, after generating new intelligence, law enforcement officials began conducting interviews nationwide on May 5, 1999. On that day, Mr. Smith, along with several other individuals, was interviewed. During the interview, Mr. Smith denied knowing what happened to Janice. When told that, during an interview in 1992, Kathy Paridon, contrary to her initial story, had said that there was no other occupant in the vehicle when Janice gave her a ride home on November 17, 1974, Mr. Smith responded that Ms. Paridon was lying.

According to Agent Hilland, when he started talking about Michael, Mr. Smith began to cry. Agent Hilland again asked about Mr. Smith's involvement in Janice's disappearance and opined that Mr. Smith was responsible. According to Agent Hilland, at that point, Mr. Smith, who was very emotional, began saying that he did not want to lie anymore, that he did not know how to begin talking about it, and that he was scared. Mr. Smith also kept saying that his life was a nightmare, which he was tired of living. Afterwards, Mr. Smith complained of feeling unwell, and the interview was eventually concluded.

As previously mentioned, Mr. Smith reported that Janice had been wearing her diamond watch the last time he saw her. Kathleen McDonald, a close friend of Mr. Smith's, testified that, in 1978, she shared with Mr. Smith her desire to buy a green watch, which she had seen advertised. According to Kathleen McDonald, Mr. Smith told her not to buy the watch and gave her a watch with a jewel beveled "J" and diamonds. Mr. Smith told her that it had belonged to his wife, who had died. The

-6-

Case No. 5:04-cv-2353
Gwin, J.

watch was admitted into evidence.

Scott Mintier, Mr. Smith's coworker at the Pullman Standard Company in Hammond, Indiana, identified the same exhibit, as the watch he had seen Mr. Smith wearing in 1977. On cross-examination, Scott Mintier admitted that he had given a slightly different description of the watch in July of 1999 but affirmed that the watch in the exhibit was the same watch he had seen Mr. Smith wearing in 1977.

Lodema Hartman ("Lodema"), Janice's younger sister, was twelve years old in 1972. She testified that she had helped Mr. Smith buy a green watch for Janice. She stated that the watch previously identified by Kathleen McDonald and Mr. Mintier looked like the watch that Mr. Smith had purchased Janice. Lodema also testified that she saw her sister at their mother's house in the fall of 1974. During that visit, for reasons unknown to Lodema, she and Janice swapped clothing. According to Lodema, just before leaving, Janice hugged her and whispered that she would see her at her graduation. Lodema's graduation, however, was four years away.

Additionally, evidence adduced at trial demonstrated that Mr. Smith had explained Janice's disappearance differently to various individuals over the years. Detective Michael Dansbury of the West Windsor Township New Jersey Police Department testified that he met with Mr. Smith on October 16, 1991. According to Detective Dansbury, during their conversation, Mr. Smith told him that he last saw Janice heading toward Florida to join a commune and that he had not seen or heard from her since. Mr. Smith denied filing a missing person report for Janice until Detective Dansbury told him that he had a copy of the report.

Dennis Evans, a long time friend of Mr. Smith's, testified that Mr. Smith had told him that Janice had left because she was testifying in a drug case.

Sandi Norwood Haynesworth, another close friend of Mr. Smith's, testified that, in 1975, Mr. Smith told her that he married Janice right out of high school and loved her very much, but that she began using drugs and hanging around rough people, so they mutually agreed to end their marriage. According to Sandi Haynesworth, Mr. Smith related that drug dealers had murdered Janice because she owed them money. Mr. Smith said that he received a telephone call from the murderers telling him to go to a particular location and that, when he went there, he saw Janice's dead body and retrieved her wedding rings. When asked, Mr. Smith stated that he did not call the police because he was afraid they would kill him.

Janice Miller, Mr. Smith's girlfriend in Connecticut in 1992, testified that she was a prostitute and a drug user to whom Mr. Smith gave money to buy drugs. After approximately one month of dating Mr. Smith, Janice Miller moved in with him. She related that she canceled a trip to Atlanta with Mr. Smith when he told her that Janice

Case No. 5:04-cv-2353
Gwin, J.

was a drug addict who was killed by a drug dealer because she was a drug informant. He related that a FBI agent gave him this information. According to Janice Miller, Mr. Smith maintained that he never saw Janice's body. Janice Miller testified that her relationship with Mr. Smith ended because he would not give her any more money and she thought he was stealing her clothing.

Sheila Sautter testified that she met Mr. Smith at work in the early 1980s in Connecticut, and they dated for approximately seven and one half years. While they lived together, Sheila Sautter discovered Mr. Smith's old resume, which indicated that Mr. Smith was divorced with no children. Up until that point, Sheila Sautter believed that Mr. Smith was single. When she confronted Mr. Smith, he denied having been married and blamed the inaccuracies on his resume as being a secretary's typographical error. However, when pressed, Mr. Smith stated that he was married for a very short time just after high school and that eventually he and Janice went on their separate ways.

In April of 1992, law enforcement officers asked Sheila Sautter to record a telephone conversation with Mr. Smith. An audiotape of the conversation was played for the jury and admitted into evidence. During the conversation, Mr. Smith denied any knowledge that Janice had been missing for all of the years. Later, Mr. Smith admitted that he had been lying to everyone, but it is unclear exactly what Mr. Smith admitted he was lying about.

Summer McGowin testified that her mother, Diane Susan Bertalan, married Mr. Smith in September of 1998. Summer McGowin related that, on July 24, 1999, she and her mother asked Mr. Smith about the box. According to Summer McGowin, Mr. Smith responded that someone dropped the box off on the front porch of his grandfather's residence and that his brother informed him that a dead female was inside. Mr. Smith stated that he did not look inside of the box and disposed of it by dumping it on the side of a farm road. Summer McGowin testified that, approximately two weeks later, she asked Mr. Smith if he killed Janice and that Mr. Smith did not answer her question. Summer McGowin also related that, after Mr. Smith was served with annulment papers, she went to be with her mother because her mother was scared.

Diane Bertalan generally confirmed her daughter's version of events. Diane Bertalan, however, testified that Mr. Smith had indicated that a dead goat was inside of the box, not a dead girl as her daughter had testified. Diane Bertalan added that she filed a missing person report listing Mr. Smith as missing when he disappeared on the evening of July 22, 1999. Mr. Smith, however, returned on July 24, 1999.

The defense presented the testimony of Leonard Bennett, Janice's date when she was attacked on November 10, 1974. He corroborated Janice's version of the events of

-8-

Case No. 5:04-cv-2353
Gwin, J.

> that night and testified that Janice was afraid of certain people in the Doylestown
> area.

*State v. Smith*, Nos. 01CA0039, 01CA0055, 2002 WL 1972931, at ¶ 2, 11-43 (Ohio Ct. App. Aug. 28, 2002).

## II. Procedural History

On August 30, 2000, the Wayne County Grand Jury issued an indictment charging Petitioner with one count of aggravated murder for the death of his ex-wife, Janice Elaine Hartman Smith, who disappeared November 17, 1974.  On July 19, 2001, a jury in the Wayne County Court of Common Pleas acquitted Petitioner of aggravated murder but found him guilty of murder, for which he received a sentence of life imprisonment with no opportunity for parole for 15 years.

On July 20, 2001, Petitioner moved for a new trial pursuant to Ohio Crim.R. 33(A)(1), that permits a new trial for "[i]rregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial."  Petitioner argued that the jury inadvertently received evidence that an earlier wife was missing, evidence that the trial court had previously ruled inadmissible, materially affected his right to a fair trial.  On September 18, 2001, the trial court denied his motion for a new trial.

On August 17, 2001, Petitioner appealed his judgment and sentence to the Wayne Court of Appeals, Ninth Appellate District.  On October 12, 2001, he also appealed the denial of his motion for a new trial to the Court of Appeals.  On August 29, 2003, after consolidating Petitioner's appeals, the Court of Appeals affirmed the judgment of the trial court.  Addressing the denial of the motion for a new trial, the Court of Appeals ruled that the trial court did not abuse its discretion when it found that the reference to Petitioner's second wife did not warrant a new trial.  The evidence simply included a description of Petitioner's statement to a friend that Petitioner did not know where this

-9-

Case No. 5:04-cv-2353
Gwin, J.

wife had gone but the New Jersey police might contact the friend.  Reviewing this argument, the Wayne County Court of Appeals found this evidence nonspecific.  The Court of Appeals also found that the reference to Petitioner's second wife was not prejudicial.  On October 9, 2002, Petitioner filed an appeal to the Supreme Court of Ohio, that it denied on January 3, 2003, as not involving any substantial constitutional question.

On May 20, 2002, Petitioner petitioned the trial court to vacate its judgment.  On November 5, 2002, the trial court dismissed his petition.  The Court of Appeals dismissed Petitioner's appeal without reaching the merits, finding his claims barred by *res judicata*.  The Supreme Court of Ohio also denied Petitioner leave to appeal and dismissed his appeal as not involving any substantial constitutional question.

On May 26, 2004, Petitioner filed an application for re-opening his direct appeal with the Wayne County Court of Appeals.  On August 3, 2004, the appellate court denied the application pursuant to App.R. 26(B), finding that Petitioner had failed to file his application with the Court of Appeals within 90 days of its decision and had failed to show good cause for his late filing.  The Court of Appeals denied Petitioner's motion to reconsider, and the Supreme Court of Ohio dismissed Smith's appeal as not involving any substantial constitutional question.

On November 29, 2004, Smith filed a Petition for Writ of Habeas Corpus with this Court, raising three grounds for relief.  In his first ground, Petitioner alleges ineffective assistance of trial counsel on six sub-grounds.  In his second ground for relief, Petitioner Smith alleges that he was denied due process when the trial court denied his Motion for New Trial after the jury inadvertently received evidence about his missing second wife that the trial court had previously ruled inadmissible.  In his third ground for relief, Petitioner alleges a denial of due process as a result of

-10-

Case No. 5:04-cv-2353
Gwin, J.

the trial court's failure to grant his Motion for Acquittal when the State allegedly failed to prove

every necessary element of the offense and when sufficient evidence did not support Petitioner's

conviction.

### III. Legal Standard

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs Smith's

petition for habeas relief pursuant to 28 U.S.C. § 2254.  Under AEDPA,

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant
> to the judgment of a State court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court proceedings unless the adjudication of
> the claim (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State court
> proceeding.

28 U.S.C. § 2254(d)(1)-(2).

The United States Supreme Court outlined the proper application of § 2254(d) in *Williams*

*v. Taylor*, 529 U.S. 362 (2000).  A federal court may grant a habeas petition under the "contrary

clause" of § 2254(d)(1) in two scenarios.  *Id.* at 405-07.  First, a state-court decision would be

contrary to clearly-established Supreme Court precedent "if the state court applies a rule that

contradicts the governing law set forth" by the Supreme Court.  *Id.* at 405.  The federal court "must

find a violation of a law clearly established by holdings of the Supreme Court, as opposed to its

dicta, as of the time of the relevant state court decision."  *Miller v. Francis*, 269 F.3d 609, 614 (6th

Cir. 2001).  "A state-court decision will also be contrary to [the Supreme Court's] clearly established

precedent if the state court confronts a set of facts that are materially indistinguishable from a

decision of this Court and nevertheless arrives at a result different from our precedent."  *Williams*,

Case No. 5:04-cv-2353
Gwin, J.

529 U.S. at 406.

A federal habeas court may also grant a writ under the "unreasonable application" clause of § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal habeas court should not conduct a subjective inquiry by asking whether "all reasonable jurists" would agree that the state court's application was unreasonable. *Miller*, 269 F.3d at 614. Rather, the state court's application of federal law must be "objectively unreasonable" in the view of the federal court. *Williams*, 529 U.S. at 410. An unreasonable application of federal law is different from an incorrect application of federal law. *Id.* A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

The Federal Magistrates Act requires a district court to conduct a *de novo* review only of those portions of the Report and Recommendation to which the parties have made an objection. 28 U.S.C. § 636(b)(1). Moreover, the factual findings of a state court are presumed to be correct. A federal court may only diverge from a state court's factual findings if the petitioner shows by clear and convincing evidence that the findings are erroneous. 28 U.S.C. § 2254(e)(1).

### IV. Analysis

Petitioner argues (1) his trial counsel was ineffective, denying him his 6th and 14th Amendment rights; (2) the trial court denied him due process of law for failing to grant a new trial; and (3) the trial court denied him due process of law for failure to grant a motion for acquittal.

Case No. 5:04-cv-2353
Gwin, J.

### A. Ineffective Assistance of Trial Counsel

For his first ground for relief, Petitioner alleges that he was denied the right to effective assistance of counsel.  He divides this claim into six sub-grounds, addressing his counsel's (a) failure to challenge biased jurors; (b) failure to move for a change of venue as a result of jury exposure to pre-trial media coverage; (c) failure to object to a lack of foundation for testimony on canine evidence from a dog handler, failure to seek expert testimony to rebut the dog handler, and failure to request a cautionary jury instruction addressing  the dog handler's testimony; (d) failure to object to prosecutorial misconduct; (e) failure to object to prejudicial, inadmissible character and bad-acts evidence; and (f) failure to elicit exculpatory testimony from a defense witness.

The magistrate judge recommends dismissing Petitioner's sixth sub-ground – failure to elicit exculpatory testimony – as procedurally defaulted because Petitioner did not present the claim to the state courts, and because he has not shown cause for the default or prejudice arising from it.  The magistrate judge also recommends dismissing Petitioner's first five sub-grounds because he has not demonstrated that his trial counsel's alleged errors were prejudicial.  Upon *de novo* review of each of these issues, the Court adopts each of the magistrate judge's recommendations.

### 1.  Procedural Default

A state prisoner must normally exhaust available state judicial remedies before a federal court will consider his Petition for Writ of Habeas Corpus.  28 U.S.C. § 2254(b)(1)(A); *Picard v. Connor*, 404 U.S. 270, 275 (1971).  Once the claim has been fully and fairly presented to the state courts, the exhaustion requirement is satisfied.  *Picard*, 404 U.S. at 275.  Nevertheless, a Petitioner procedurally defaults a constitutional claim presented to a federal court when he presents the claim upon a different theory than was presented to the state courts.  *Wong v. Money*, 142 F.3d 313, 322

Case No. 5:04-cv-2353
Gwin, J.

(6th Cir. 1998).

Frequently, habeas petitioners fail to comply with state procedural rules and the state courts dismiss the constitutional claims without reaching their merits.  When a petitioner has defaulted his constitutional claims in state court under a state procedural rule, federal habeas review of his claims is barred unless he can (1) demonstrate both cause for the default and actual prejudice resulting from the alleged constitutional violation, or (2) show that failure to consider his claims will lead to a fundamental miscarriage of justice.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

A petitioner can establish cause for the procedural default by showing that his counsel ineffectively failed to satisfy state procedural rules necessary to preserve a constitutional claim for review.  *Ege v. Yukins*, 485 F.3d 364, 378 (6th Cir. 2007).  But the exhaustion requirement generally demands that "a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default."  *Murray v. Carrier*, 477 U.S. 478, 489 (1986).

In his sixth sub-ground, Petitioner argues that his counsel's performance was deficient for failing to elicit exculpatory evidence from Leonard Bennett, a defense witness who was with Janice the night she was attacked, on November 10, 1974.  The prosecution successfully objected when trial counsel asked Bennett if Janice had ever indicated that she was afraid of anyone, or if she had ever said she thought she was going to disappear.  Petitioner argues that his counsel's failure to successfully elicit testimony about threats made by people other than Petitioner to Janice was prejudicial and deprived him of a fair trial.  Petitioner also argues that the Court of Appeals found Petitioner's trial counsel deficient, and that he has presented the same theory of ineffective assistance of counsel to both the state and federal courts.

-14-

Case No. 5:04-cv-2353
Gwin, J.

Petitioner's argument is without merit.  Initially, Petitioner incorrectly contends that the Court of Appeals found his trial counsel deficient.  When considering Petitioner's assignment of error concerning ineffective assistance of counsel, the Court of Appeals merely "assum[ed], without deciding, that trial counsel's performance was deficient" before concluding that the outcome of the trial would have been the same, regardless of whether Petitioner's trial counsel was ineffective.

Moreover, before the Court of Appeals, Petitioner never made the argument that his trial was ineffective for failing to elicit exculpatory testimony from Bennett.  Instead, the Petitioner argued that the *trial court* erred in refusing to allow his counsel to elicit testimony from Bennett.  Given that Petitioner now presents his claim to this Court on a different theory than was presented to the state court, the claim is procedurally defaulted.

Therefore, habeas review of the claim is barred unless Petitioner can show (1) cause for the default and prejudice from the alleged ineffective assistance of counsel, or (2) that failure to consider his claim will result in a fundamental miscarriage of justice.  To show cause, Petitioner must demonstrate that his *appellate* counsel represented him ineffectively by failing to raise an ineffective assistance of counsel claim regarding *trial* counsel's failure to elicit exculpatory testimony.  The Petitioner attempted to present such a claim to the Court of Appeals in his application to re-open his appeal, filed pursuant to Ohio App. R. 26(B).  Regardless, Petitioner procedurally defaulted this claim, as well, because he failed to file his application to re-open within ninety days of the Court of Appeals' denial of his direct appeal and did not show good cause for the delay.  Thus, Petitioner failed to fully and fairly present a claim of ineffective assistance of *appellate* counsel to the state courts.  He may not assert this ground as cause for the procedural default of his claim for ineffective assistance of *trial* counsel.

Case No. 5:04-cv-2353
Gwin, J.

Finally, Petitioner has not demonstrated that a failure to consider this sub-ground on the merits will result in a fundamental miscarriage of justice.  With this sub-claim, Petitioner argues that the trial court unreasonably restricted his right to present a defense when it sustained an objection to Bennett's testimony.  Petitioner Smith says this restricted his ability to establish that someone else might have killed Janice.

As an initial matter, Petitioner's objections to actions or decisions of the trial court do not lie within the scope of an ineffective assistance of counsel claim.  Petitioner must raise arguments that the trial court erred as independent grounds for relief, apart from a claim that Petitioner's trial counsel was ineffective.  Further, and as the Ohio Court of Appeals noted, the trial court did not unduly restrict Bennett's examination.  Instead, the trial court permitted Bennett to testify that Janice had expressed fear of certain people.  The trial court sustained an objection to his counsel's question as to whether Janice Smith had told Bennett that she might disappear.  The trial court sustained the objection, however, for lack of foundation as to when and under what circumstances Janice thought she might disappear.  The court did not prohibit Petitioner from eliciting testimony on that issue.  Petitioner simply chose not to pursue the matter.  Thus, the trial court never denied Petitioner his right to introduce testimony on Janice Smith's statements to Bennett.

Moreover, it is nowhere clear that such testimony was otherwise admissible.  As described, Petitioner Smith says his trial counsel should have elicited testimony from Bennett that she feared that she might disappear.  Such testimony seems obvious hearsay.  If permitted, Bennett would testify regarding an out-of-court statement by Janice Smith to prove that Janice Smith truly feared she might disappear to further prove that Janice Smith enjoyed good grounds for such fear.  Bennett's testimony would be hearsay and not admissible under any hearsay exception.

-16-

Case No. 5:04-cv-2353
Gwin, J.

For these reasons, this Court's failure to consider this sub-ground will not result in a fundamental miscarriage of justice.

Therefore, Petitioner has procedurally defaulted the sixth sub-ground of his claim of ineffective assistance of trial counsel.

2.  Failure to Satisfy the Prejudice Prong of the *Strickland* Test

*a.  Legal Standard*

The Supreme Court outlined the test governing claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984).  The benchmark for any such claim is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

A claim of ineffective assistance of counsel has two components: a petitioner must show (1) that his counsel's performance was deficient; and (2) that he was prejudiced by that deficient performance. *Id.* at 687.  To show deficiency, a petitioner must demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*  But "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691.

To demonstrate prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  When assessing prejudice, the reviewing court must weigh the evidence in aggravation against the totality of available mitigating evidence. *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

-17-

Case No. 5:04-cv-2353
Gwin, J.

"Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687.  The reviewing court need not address both components of an ineffective assistance of counsel claim if the petitioner makes an insufficient showing of one component.  *Id.* at 697.  "In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."  *Id.* Rather, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  *Id.*

b.  *Petitioner's Grounds for Ineffective Assistance of Counsel*

Petitioner asserts five remaining sub-grounds justifying his overarching claim of ineffective assistance of trial counsel.  Sub-ground (f) was procedurally defaulted.  *See supra* Part IV.A.1.  In sub-ground (a), Petitioner alleges that his trial counsel was ineffective for failing to challenge for cause biased jurors whose statements during *voir dire* indicated that they could not be fair and impartial.  In support of his claim that counsel was ineffective for failing to challenge certain jurors for bias, he cites jurors who, in response to the question whether they could be fair and impartial, stated "Yeah," "Yeah I think I could," and "I think so."

In sub-ground (b), Petitioner alleges that his trial counsel was ineffective for failing to move for a change of venue.  Petitioner claims that pervasive pre-trial publicity was prejudicial and that trial counsel should have moved for a change of venue to ensure an impartial jury.

In sub-ground (c), Petitioner alleges that his trial counsel failed to reasonably respond to the testimony of Sandra Anderson, a prosecution expert witness and handler of a cadaver dog.

-18-

Case No. 5:04-cv-2353
Gwin, J.

Anderson's dog searched Petitioner's grandparents' garage where Petitioner's brother had previously found the box containing Janice's remains.  The cadaver dog alerted to a particular location within the garage where the box had allegedly rested.

Petitioner argues that trial counsel (1) failed to object to the lack of foundation required for Anderson's testimony concerning the dog's reactions; (2) failed to consult with or seek the testimony of an expert witness to rebut Anderson; and (3) failed to request that the trial court issue a cautionary jury instruction regarding Anderson's possible bias favoring the dog.  In an unrelated case in September 2004 and long after Petitioner Smith's July 19, 2001, conviction, Anderson was convicted of planting evidence, and the Department of Justice notified Petitioner's appellate counsel in May 2002 that Anderson was being investigated.  Petitioner argues that his trial counsel's failure to challenge Anderson's testimony was even more prejudicial given these significant concerns about her credibility.

In sub-ground (d), Petitioner alleges that his trial counsel was ineffective for failing to object to prosecutorial misconduct.  Petitioner contends that during closing arguments, the prosecutor (1) impermissibly commented that Petitioner did not testify; (2) argued facts not in evidence by offering a new theory of the case; (3) highlighted allegedly inadmissible "bad character" evidence; (4) misstated facts, contradicting the prosecution's own witnesses; (5) provided an unredacted exhibit containing evidence the trial court had previously ruled inadmissible; and (6) vouched for Anderson's credibility.  Petitioner claims that his trial counsel's failure to object to or rebut the prosecution's improper statements denied him a fair trial.

In sub-ground (e), Petitioner alleges that his trial counsel was ineffective for failing to object to "prejudicial, inadmissible, irrelevant character and bad acts evidence" in the state's case.

-19-

Case No. 5:04-cv-2353
Gwin, J.

Petitioner claims that the prosecution painted him as a man with a bad temper, despite a pre-trial ruling prohibiting such testimony, and that the prosecution called Petitioner's former wives and girlfriends to convey the message that he was a stalker and a serial killer, without any objection from his trial counsel. Petitioner also argues that his trial counsel failed to object to the admission of an unredacted exhibit that contained allegedly inadmissible lay opinions from Petitioner's brother about his guilt. Petitioner contends that these deficiencies denied him a fair trial.

*c. Failure to Demonstrate Prejudice*

The Court of Appeals properly considered Petitioner's ineffective assistance of counsel claim under the *Strickland* test. Assuming, without deciding, that Petitioner's trial counsel was deficient, the Court of Appeals found no reasonable probability that, but for trial counsel's alleged errors, the result of the trial would have been different. Having failed to make such a showing, the Court of Appeals found Petitioner failed to meet the prejudice prong of the *Strickland* test. Having failed to make the necessary showing of prejudice, the Court of Appeals dismissed his claim of ineffective assistance of counsel.

This Court agrees. Ample evidence supports Petitioner's conviction for Janice Smith's murder. Initially, Petitioner's brother Michael gave very damaging evidence. Michael testified that immediately after Janice disappeared, Petitioner told him that victim Janice Smith had entered a witness-relocation program because she was a drug informant. Michael also testified that soon after Janice's disappearance, around Thanksgiving of 1974, he found Petitioner building a long, narrow plywood box in their grandparents' garage in Seville, Ohio. Petitioner told Michael that he was building the box to store Janice's belongings, but Petitioner became angry when Michael noted that the dimensions of the box were unusual for storage. Michael further testified that when he returned

-20-

Case No. 5:04-cv-2353
Gwin, J.

to the garage later that day, Petitioner had completed the box and was rolling up Janice's clothes, rather than folding them, and tucking the clothing around the edges of the box.

Upon opening the box in 1979 and after it had remained in Petitioner's grandparents garage since constructed, the Petitioner's brother Michael said he discovered a human skeleton. Michael testified that the legs of the skeleton had been sawed off below the knee and that he believed the remains in the box were Janice's. Michael testified that he called Petitioner in Hammond, Indiana, and informed him of what he had found in the box. Michael testified that Petitioner then drove to their grandparents' house and retrieved the box later that night. When Petitioner arrived, he explained Janice's death by telling Michael that two men had drugged him and taken him to a warehouse. When Petitioner awoke, Janice was dead, and an FBI agent and the Wayne County Sheriff threatened to frame Petitioner for murder. Michael also testified that Petitioner said he was taking the box to Hammond, Indiana.

In 1980, the Newton County Sheriff's Department discovered an unidentified body in a plywood box, near Hammond, Indiana. The box also contained various items of clothing and a quilt that were packed into and around the box. In March 2000, police exhumed the remains and identified the remains as Janice's. Dr. Steven A. Symes, a forensic anthropologist, testified that Janice's lower legs were sawed off after she died. A cadaver dog later searched Petitioner's grandparents' garage where the box had allegedly been stored. The dog's handler, Sandra Anderson, testified that the dog alerted to the odor of human remains in one of the two locations where the box was described as having been kept.

In a telephone conversation recorded July 1999, Petitioner Smith told his brother Michael that someone had placed a goat in the box as a practical joke, and that the box was nowhere near

-21-

Case No. 5:04-cv-2353
Gwin, J.

Seville.  In another recorded phone call, Michael lied to Petitioner and told him that he – Michael – was scheduled to testify before a grand jury.  Petitioner disappeared for a few days immediately thereafter.

FBI Special Agent Robert Hilland testified that, in an interview with Petitioner in May 1999, Petitioner began to cry when Hilland started talking about Michael and was very emotional when Hilland asked about Petitioner's involvement in Janice's disappearance.  Petitioner stated that he was scared and did not want to lie anymore.

When Petitioner filed a missing-person report after Janice's disappearance in 1974, he told police that Janice was wearing her wedding and engagement rings and a diamond watch when she was last seen.  Petitioner's friend, Kathleen McDonald, testified that in 1978 Petitioner gave her a watch with diamonds and a jewel-beveled "J," telling McDonald it belonged to his wife who had died.  A co-worker of Petitioner's identified the same watch as one he saw Petitioner wearing in 1977.  Janice's younger sister, Lodema Hartman, testified that the watch appeared to be the same watch Petitioner had purchased for Janice.

Finally, Petitioner offered numerous conflicting stories when explaining Janice's disappearance to different people during the 25 years following her disappearance.  Detective Michael Dansbury of the West Windsor Township  Police Department testified that in 1991, Petitioner told him that Janice was last seen going to Florida to join a commune, and that he had not heard from her since.  Petitioner denied filing a missing-person report for Janice until Detective Dansbury told him he had a copy of the report.

Petitioner Smith made other conflicting statements.  Petitioner's friend, Dennis Evans, testified that Petitioner told him Janice had left town to testify in a drug case.  Sandi Norwood

-22-

Case No. 5:04-cv-2353
Gwin, J.

Haynesworth, another friend of Petitioner's, testified that Petitioner told her that drug dealers had murdered Janice, and that he had retrieved rings from her dead body. Janice Miller, a former girlfriend of Petitioner's, testified that Petitioner told her Janice was killed by a drug dealer, and that he learned about her death from an FBI agent but had never seen her body.

Sheila Sauter, another former girlfriend of Petitioner's, testified that Petitioner denied having ever been married. In a taped 1992 conversation between Sauter and Petitioner, Petitioner also denied any knowledge that Janice had been missing. Later in the conversation, Petitioner admitted he had been lying to everyone, although it was not clear what he admitted to lying about.

Summer McGowin, whose mother married Petitioner in 1998, testified that she and her mother asked Petitioner about the box in July 1999. Petitioner claimed that someone had dropped the box off at his grandfather's residence and that his brother informed Petitioner that it contained a dead woman. Petitioner told McGowin that he did not look inside the box, but simply dumped it on the side of a road.

Assuming, without deciding, that Petitioner's trial counsel's performance was deficient as Petitioner alleges in each of his five preserved sub-grounds, in light of the considerable evidence introduced against Petitioner at trial, the Court cannot find a reasonable probability that but for his trial counsel's errors, the result of Petitioner's trial would have been different. The alleged errors of Petitioner's trial counsel, even when considered in the aggregate, do not undermine the Court's confidence in the outcome of Petitioner's trial. Petitioner has failed to demonstrate that his trial counsel's alleged errors had a prejudicial effect on the determination of his guilt. As such, Petitioner's claim of ineffective assistance of trial counsel fails.

*B. Due Process Violation for Failure to Grant Motion for New Trial*

-23-

Case No. 5:04-cv-2353
Gwin, J.

In his second ground for relief, Petitioner alleges that the trial court violated his right to due process by denying his Motion for New Trial. The Petitioner had moved for a new trial after he discovered that members of the jury were mistakenly exposed to some of the New Jersey Evidence concerning the disappearance of Petitioner's second wife. The trial court had previously ruled that the New Jersey Evidence was inadmissible. A small portion of this evidence, however, was inadvertently received into evidence without objection at the close of evidence as part of a state exhibit. Petitioner argues that the inclusion of this inadmissible evidence so influenced the jury that the trial court's failure to grant a new trial violated his right to due process.

In reviewing Petitioner Smith's motion for a new trial, the Ohio Court of Appeals examined the trial court's decision for abuse of discretion. The arguably improperly admitted evidence was brother Michael Smith's statement that in a "a phone call from John between Thanksgiving and Christmas of 1991. John told me that he was married, his wife was missing, and that the police from New Jersey would be coming to talk to me. John also told me to tell my grandparents. * * * I was shocked because John had just been home for Thanksgiving holiday with Sheila. When John had called me that was the first time I ever knew he was married again, and the first time I ever heard of Fran." *State v. Smith*, 2002 WL 1972931 at ¶ 53. Finding the exhibit containing Michael Smith recollection of Petitioner Smith's statement was bland and non-prejudicial, the Ohio Court of Appeals held that Petitioner failed to demonstrate that the outcome of his trial would have been different if the alleged improper evidence had not been admitted. As such, the Court of Appeals ruled that the trial court did not abuse its discretion in denying Petitioner's Motion for a New Trial.

Pursuant to AEDPA, Petitioner needs to show that the decision of the Court of Appeals was (1) contrary to, or based on an unreasonable application of, clearly established federal law, as

-24-

Case No. 5:04-cv-2353
Gwin, J.

determined by the Supreme Court; or (2) based on an unreasonable determination of the facts in light of the evidence presented in state-court proceedings.   In her Report and Recommendation, Magistrate Judge Hemann found that Petitioner is not entitled to habeas relief because he failed to make such a showing.

Petitioner objects to the Report and Recommendation.  He argues that the trial court was wrong in finding that the jury's exposure to the New Jersey Evidence was not an irregularity entitling to him a new trial because the trial court disregarded the fact that it had previously ruled the evidence inadmissible.  Petitioner also argues that the trial court was required to hold an evidentiary hearing to determine the prejudicial effect of the New Jersey Evidence on the jurors. Because the trial court did not conduct such a hearing, Petitioner claims that bias must be presumed and that he is entitled to a new trial or, at minimum, an evidentiary hearing.  The Court reviews Petitioner's objections *de novo*.

1.  Trial Court Evaluation

Ohio Crim.R. 33(A)(1) permits the granting of a new trial in the event of "[i]rregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial."  Thus, a petitioner must show (1) an irregularity or abuse of discretion which (2) prevented a fair trial.  The improper admission of evidence offered against a defendant is not grounds for a new trial "unless the defendant was or may have been prejudiced thereby."  Crim.R. 33(E)(3).  Nor is any other cause grounds for a new trial "unless it affirmatively appears from the record that the defendant was prejudiced thereby or was prevented from having a new trial."  Crim.R. 33(E)(5).  Granting a new trial pursuant to Crim.R. 33 is "within the sound discretion of the trial court, and an appellate court cannot reverse the trial

Case No. 5:04-cv-2353
Gwin, J.

court's order unless there has been an abuse of that discretion."  *State v. Shepard*, 468 N.E.2d 380, 383 (Ohio Ct. App. 1983).  An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary or unconscionable.  *State v. Clark*, 644 N.E.2d 331, 335 (Ohio 1994).

In his motion for a new trial, the Petitioner argued that the inadvertent admission of the New Jersey Evidence referring to his second wife was an irregularity that impermissibly interfered with his right to a fair trial.  In denying his motion, the trial court found that the exhibit in question had been properly admitted after Petitioner's counsel failed to object.  As such, the exhibit's admission did not violate Ohio R.C. 2945.35, which describes what material a jury may consider during deliberations.  Therefore, the trial court concluded that there was no irregularity entitling Petitioner to a new trial.  See also Ohio Evid. R. 103(A) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection.")

The trial court further held that Petitioner had not been prejudiced by the portion of the New Jersey Evidence inadvertently admitted.  Rather, the trial court found that the evidence in this case, "clearly and compellingly pointed to" Petitioner as the person responsible for Janice's death, regardless of the jury's exposure to an inconsequential portion of the New Jersey Evidence.  As such, the trial court ruled that Petitioner had received a fair trial.

Petitioner's trial counsel did not object to State Exhibit 48.  Petitioner did not raise the issue of ineffective assistance of counsel with regard to the New Jersey Evidence, arguing in his Motion for a New Trial only that the inadvertent admission of evidence was an irregularity.  Ineffective assistance of counsel, however, is a cognizable claim in a motion for new trial pursuant to Crim.R.

-26-

Case No. 5:04-cv-2353
Gwin, J.

33(A)(1), *State v. Lordi*, 748 N.E. 2d 566, 572 (Ohio Ct. App. 2000); and the trial court appears to have raised the issue *sua sponte*.

To prevail on a claim of ineffective assistance of counsel, the Petitioner needs to satisfy the two-prong *Strickland* test by demonstrating (1) that his trial counsel's performance was deficient; and (2) that he was prejudiced by that deficient performance.  *Strickland*, 466 U.S. at 687.  The trial court did not determine whether Petitioner's counsel was deficient, but instead found that Petitioner Smith had not been prejudiced by his counsel's failure to object to the New Jersey Evidence and was not entitled to a new trial.

By examining whether Petitioner had demonstrated (1) an irregularity or abuse of discretion that (2) prevented a fair trial, the trial court used the proper standard in overruling Petitioner's motion for a new trial.  Whether the claimed irregularity was the result of an inadvertent admission of evidence or the ineffective assistance of counsel, Petitioner was required to show that the admitted portion of the New Jersey Evidence was prejudicial and prevented Petitioner from receiving a fair trial.  The trial court reasonably determined that Petitioner failed to make such a showing, and thus properly overruled his motion.

2.  Court of Appeals Evaluation

The Court of Appeals reviewed the trial court's finding that the inadvertent admission of the New Jersey Evidence was not sufficiently prejudicial under an abuse of discretion standard and affirmed the trial court's decision upon finding no such abuse.  The New Jersey Evidence, State's Exhibit 48, makes only limited references to Petitioner's second wife.  Regarding Betty Fran Smith, State's Exhibit 48 contains only two questions and two answers in a seven-page statement Michael provided to the FBI in 1999.  Michael told the FBI that he had never met Betty Fran.  He said he first

-27-

Case No. 5:04-cv-2353
Gwin, J.

heard of Betty Fran, and learned that she was missing, in a phone call from Petitioner in 1991.

Michael said Petitioner told him that Betty Fran had left a note and never returned.  Michael also

said Petitioner told him during that phone call that police from New Jersey would be coming to talk

to Michael.[1/]

Importantly, the statement simply mentioned that Petitioner had a second wife who had

disappeared.

In response, the Petitioner cites a newspaper article in which the jury forewoman was quoted

as stating that knowing about the disappearance of Betty Fran could have planted "a lot of things

in back of (jurors') minds" and that "[i]t could have made (a guilty verdict) easier to consider . . .

."  In that same article, however, the forewoman also explained that the jurors decided among

themselves to disregard the reference to Betty Fran.  A juror also informed the trial court, when the

trial court first discovered the reference to Betty Fran in the exhibit, that the jurors did not consider

the exhibit in reaching their verdict.  Furthermore, some of the jurors eventually empaneled revealed

during *voir dire* that they knew Petitioner had a second wife who had also disappeared.  Yet, the trial

---

[1/]State's Exhibit 48 only reference to the New Jersey Evidence is the following:

"Q:      Did you ever know or meet Betty Fran Smith?

"A:      No.

"Q:      Did John [Smith] ever discuss Betty Fran's disappearance with you?

"A:      Yes. He told me that she left a note and never came back. One day I got a phone call from
John between Thanksgiving and Christmas of 1991. John told me that he was married, his
wife was missing, and that the police from New Jersey would be coming to talk to me. John
also told me to tell my grandparents. * * * I was shocked because John had just been home
for Thanksgiving holiday with Sheila. When John had called me that was the first time I ever
knew he was married again, and the first time I ever heard of Fran."

*State v. Smith*, 2002 WL 1972931, ¶¶ 50-53.

Case No. 5:04-cv-2353
Gwin, J.

court ruled that this information was not sufficiently prejudicial as to infect the jury with bias and prevent a fair trial.

This evidence seems obviously incompetent and it is not clear why the trial court, or the Ohio Court of Appeals would consider such evidence.  See Ohio Evid. R. 606 ("Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. ") While evidence regarding the jury's deliberative process was incompetent, the Ohio Court of Appeals nevertheless seemed to have considered it.  Even after considering the evidence in violation of the aliunde rule, the Ohio Court of Appeals found no showing of prejudice.

In light of these facts, the Court agrees with the Court of Appeals that the trial court did not abuse its discretion in finding no prejudice.  Under AEDPA, Petitioner fails to show that the denial of his Motion for New Trial was contrary to, or involved an unreasonable application of, clearly-established federal law as articulated by the holdings of the Supreme Court.  Nor has Petitioner shown that the denial of his Motion for New Trial was based on an unreasonable determination of the facts in light of the evidence presented.

2.  Evidentiary Hearing

Next, Petitioner argues that upon discovering that the jury had been exposed to inadmissible evidence, the trial court had a duty to conduct an evidentiary hearing to determine whether the evidence had a prejudicial effect on the jurors.  Petitioner contends that the trial court's failure to conduct such a hearing creates a presumption of bias and necessitates a new trial. Petitioner argues

-29-

Case No. 5:04-cv-2353
Gwin, J.

that he should have received an evidentiary hearing.

The Petitioner's argument has some clear problems.  First, no one says that extraneous prejudicial information was improperly brought to the jury's attention.  State's Exhibit 26 was admitted into evidence.  Under Ohio Evid. R. 606(B), jurors "may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith."  Unlike cases where an outside influence was exerted upon a juror, Exhibit 26 was properly admitted, seemingly without objection.  This case stands in sharp contrast with *Remmer v. United States*, 347 U.S. 227, 229-30 (1954) Where the Supreme Court required a hearing where unnamed person had remarked to a juror during trial that he could profit by bringing in a verdict favorable to defendant and that the matter had been investigated by Federal Bureau of Investigation at judge's request.

In the instant case, Petitioner's argument that the trial court had a duty to hold a *Remmer* hearing fails.  The admission of Michael's statement to the FBI, without redaction of the reference to Betty Fran's disappearance, was not an outside improper influence.  In his Motion for New Trial, Petitioner stated that the evidence in question was "inadvertently admitted."  Likewise, in his petition to this Court for habeas relief, Petitioner conceded that the exhibit was "mistakenly admitted."

Additionally, the unredacted questions and answers concerning Petitioner's second wife do not have an obvious potential for improperly influencing a jury.  The statement merely established that Petitioner had a second wife who disappeared.  The trial court found this information was not sufficient to establish bias or impair due process.  The Court of Appeals agreed.  The Court of

-30-

Case No. 5:04-cv-2353
Gwin, J.

Appeals decision was objectively reasonable.

Therefore, the Court finds that the trial court did not abuse its discretion in denying Petitioner's Motion for New Trial without holding an evidentiary hearing.  Petitioner has not shown that the Court of Appeals' affirmation of the trial court's denial of Petitioner's Motion for New Trial was (1) contrary to, or based on an unreasonable application of, clearly established federal law, or (2) based on an unreasonable determination of the facts in light of the evidence presented.

*C.  Due Process Violation for Failure to Grant Motion for Acquittal*

For his third ground for relief, Petitioner alleges that the trial court violated his right to due process by denying his Motion for Acquittal when (1) the prosecution failed to prove the *corpus delicti*; and (2) Petitioner's conviction was not supported by sufficient evidence.

The Ohio Court of Appeals reviewed the trial court's decision to determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *State v. Herring*, 762 N.E.2d 940, 950 (Ohio 2002).  The Court of Appeals noted that circumstantial evidence alone may be sufficient to establish the *corpus delicti* and elements of a crime.  Upon reviewing the testimony presented at trial, the Court of Appeals found sufficient evidence to permit rational jurors to determine that the prosecution had established the *corpus delicti* and the elements of murder beyond a reasonable doubt.  As such, the Court of Appeals concluded that the trial court had not erred in denying Petitioner's Motion for Acquittal.

Pursuant to AEDPA, Petitioner must show that the decision of the Court of Appeals was (1) contrary to, or based on an unreasonable application of, clearly established federal law, as determined by the Supreme Court; or (2) based on an unreasonable determination of the facts in light

-31-

Case No. 5:04-cv-2353
Gwin, J.

of the evidence presented in state court proceedings.  Magistrate Judge Hemann, in her Report and

Recommendation, found Petitioner is not entitled to habeas relief on this ground.

Petitioner objects to this finding and recommendation.  Initially, Petitioner argues that by

failing to prove the cause of Janice's death, the state failed to prove the *corpus delicti* and therefore

could not convict him of murder.  Second, Petitioner argues that his conviction was against the

weight of the evidence.  He emphasizes that Janice was a drug informant who was sexually assaulted

and threatened by several men on November 10, 1974, a week before she disappeared.  Finally,

Petitioner argues that the state presented no evidence that he intended to kill Janice and therefore

failed to prove all of the elements of murder.  The Court reviews Petitioner's objections *de novo*.

The *corpus delicti* of murder has two elements: (1) the fact of death; and (2) the existence

of the criminal agency of another as the cause of death.  *State v. Nicely*, 529 N.E.2d 1236, 1240

(Ohio 1988).  "[T]he identity of the criminal agent is not part of the *corpus delicti*, since the purpose

is simply to establish that the crime occurred."  *State v. Van Hook*, 530 N.E.2d 883, 889 (Ohio

1988).  Circumstantial evidence alone may suffice to establish the *corpus delicti* of a crime.  *Nicely*,

529 N.E.2d at 1240-43.

Petitioner's argument that the state did not prove the *corpus delicti* because it did not prove

the cause of Janice's death is flawed.  The prosecution is not required to prove the specific cause of

death to establish the *corpus delicti*; it must merely show that the death occurred due to the criminal

activity of some other person.  Given the substantial evidence recounted above and the gruesome

details present in this case – particularly the fact that Janice's body was discovered with her legs

severed below the knees post-mortem in a four-feet-long box that was abandoned on the side of a

highway and stuffed with articles of Janice's clothing – it is reasonable to conclude that Janice's

-32-

Case No. 5:04-cv-2353
Gwin, J.

death was the result of the criminal agency of another person.

Petitioner's argument that his conviction was against the weight of the evidence also fails. A federal court reviewing a petition for habeas relief on the ground of insufficient evidence may grant the writ only "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307 (1979). The Ohio Court of Appeals applied this same standard to Petitioner's direct appeal of his conviction. In giving further review to Petitioner's claim that there was insufficient evidence, the evidence must be considered in the light most favorable to the prosecution. *Id.* at 319.

"Circumstantial evidence may support a conviction . . . and such evidence need not remove every reasonable hypothesis except that of guilt." *Apanovitch v. Houk*, 466 F.3d 460, 488 (6th Cir. 2006). Therefore, while it may be true that Janice was assaulted and threatened shortly before she disappeared, and other people may have wished to kill her, the hypothesis that someone other than Petitioner murdered Janice is irrelevant when considering the issue before the Court. The Court must only determine whether, upon the evidence adduced at trial, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. Considering all evidence in the light most favorable to the prosecution, the Court holds that a rational trier of fact could have found Petitioner guilty beyond a reasonable doubt.

Finally, the Court rejects Petitioner's argument that the state failed to prove all of the elements of murder because it did not show that he intended to kill Janice. Petitioner was convicted of murder pursuant to Ohio R.C. 2903.02, which states in relevant part, "No person shall purposely cause the death of another . . . ." R.C. 2903.02(A). "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct

Case No. 5:04-cv-2353
Gwin, J.

of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22.

Petitioner's claim that the prosecution produced insufficient evidence of his intent to kill Janice must also be evaluated by the standard articulated in *Jackson* and *Apanovitch*.  Again, the circumstances surrounding Janice's death and the disposal of her remains strongly suggest that her death was intentional, not accidental or the result of suicide.  Considering the ample evidence present in this case in the light most favorable to the prosecution, the Court holds that a rational trier of fact could have found that Petitioner intended to kill Janice.

For the foregoing reasons, Petitioner fails to show that the Court of Appeals' affirmation of the trial court's denial of Petitioner's Motion for Acquittal was (1) contrary to, or based on an unreasonable application of, clearly established federal law, or (2) based on an unreasonable determination of the facts in light of the evidence presented.

## V.  Conclusion

For the aforementioned reasons, the Court hereby **ADOPTS** Magistrate Judge Hemann's Report and Recommendation and **DENIES** Smith's Petition for Writ of Habeas Corpus.  Further, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith, and no basis exists upon which to issue a certificate of appealability.  28 U.S.C. § 2253(c); FED. R. APP. P. 22(B).

IT IS SO ORDERED.


Dated: August 21, 2007                           s/           *James S. Gwin*
                                                 JAMES S. GWIN
                                                 UNITED STATES DISTRICT JUDGE